Alexander COMFORT, Plaintiff,

v.

The FUND FOR the REPUBLIC, INC., a corporation doing business as the Center For the Study of Democratic Institutions, Defendant.

The FUND FOR the REPUBLIC, INC., a corporation doing business as the Center For the Study of Democratic Institutions, Counterclaimant,

v.

Alexander COMFORT and Modsets Securities Limited, Counterdefendants.

No. CV 75–2510–DWW.

United States District Court, C. D. California.

Nov. 22, 1976.

Ira H. Lurvey, Charles Daly, Pacht, Ross, Warne, Bernhard & Sears, Inc., Los Angeles, Cal., for plaintiff and counterclaim defendant Alexander Comfort.

Price, Postel & Parma, Santa Barbara, Cal., for defendant and counterclaimant The Fund for the Republic, Inc.

Robert Yale Libott, Jones & Libott Incorporated, Los Angeles, Cal., for Modsets Securities Limited and Mitchell Beazley Limited (California Counsel).

William M. Borchard, Kaye, Scholer, Fierman, Hays & Handler, New York City, for Modsets Securities Limited and Mitchell Beazley Limited (New York Counsel).

## MEMORANDUM OPINION

DAVID W. WILLIAMS, District Judge.

In his spare time from his duties as a professor in a London college, Dr. Alexander Comfort wrote what proved to be a popular book which he titled *"The Joy of Sex"*, (hereinafter *Joy*). It was published by Modsets Securities, Ltd., (hereinafter Modsets) a British Company. After signing the publishing contract Comfort realized that his gathering wealth from royalties was going to be substantially taken from him in English taxes and he contrived a scheme to salvage those funds. He would find an American nonprofit organization that would claim that it had contractual rights to the copyright of *Joy* and together they would direct the flow of the money in American dollars rather than English pounds to the American organization. It would then share these royalties with Comfort who planned to become a resident of this country. Then, only the lower American taxes would be due on the author's portion.

The Fund for the Republic was formed in New York in 1952. Its board of directors consisted of some 25 wealthy persons who contributed generously to its work. In 1959 the Fund established the Center for the Study of Democratic Institutions with a mandate to identify and clarify basic world issues and widen the circles of discussion about them. Its project became to establish a collegium where persons of many disciplines could work in an intellectual setting and where intense research could be encouraged. The Fund purchased several acres of choice land in Santa Barbara, California which contained a mansion suitable for offices and conference rooms and it was called The Center for the Study of Democratic Institutions. The grounds became known as Eucalyptus Hill. The distinguished Dr. Robert M. Hutchins, former President of the University of Chicago and former dean of Yale Law School, became titular head of a group of scholars including Harry Ashmore, Rexford Tugwell, Norton Ginsburg and Harvey Wheeler. These were full-time salaried academicians who resided near the Center and who participated in its regular intellectual dialogues and research projects.

Dr. Comfort, a gerontologist and an acknowledged British scholar, had participated in the work of the Center prior to writing *Joy*. He had come to Eucalyptus Hill many times since 1969 on expense-paid visits. Dr. Hutchins was impressed by him and wanted him to join the organization as a Senior Fellow. Comfort resisted these invitations until he became enmeshed in tax problems surrounding his book, and then he realized that the Center might be exactly the type of nonprofit American organization that his English tax counsel had told him could be used as a conduit to funnel *Joy's* royalties to America and away from the British tax collector. Moreover, Comfort wanted to escape to America and get away from a distressing marriage and the boring tedium his long years at the London college had brought. He solicited a formal invitation from Hutchins to join the Center staff and was given a letter employment contract at $28,000 per year plus unspecified severance pay upon termination.

Comfort then proposed the book contract to his new colleagues, mailing them from London several drafts of the agreement he

wanted to negotiate with them. He proposed to assign the copyright of *Joy* to the Center so it could collect the royalties from Modsets; then the Center would remit 80% of the money to plaintiff and retain 20% to itself. The men on Eucalyptus Hill were uncomfortable with Comfort's scheme but the thought of adding him to the staff, plus having him effectively pay his own salary was tempting. The shabby pact was one in which Comfort untruthfully represented that he had written *Joy* in the United States and under the auspices of the Center while using its facilities; the Center winked at the fraud.

By September of 1974 the financial condition of the Center became a matter of serious concern, and a drive for the raising of an endowment of several million dollars was a failure. The board of directors of the Fund for the Republic considered several proposals for the restructuring of the organization, settling on a "Chicago Plan" which called for the virtual abandonment of the operation at Eucalyptus Hill, the termination of the concept of a staff of full-time Senior Fellows, the eventual sale of the Santa Barbara realty upon which the Center was located, and the removal of most of future research to Chicago where a cluster of established institutions of higher learning would provide a source for a new proposed group of part-time academicians to carry out the Center's research work. On May 10, 1975, the board terminated all the Senior Fellows except Alexander Comfort,[1] who was asked to stay on because of the contract arrangement had with him. This uprooting of the staff and the prospect of an end to the Eucalyptus Hill dialogues was so disturbing to Comfort that he rejected the board's invitation to remain, moved his effects from the building, and announced that he considered his book contract with the Center at an end.

■ At the trial, by the use of evasive testimony and feigned legal ignorance, Comfort would have the Court believe that he joined the Senior Fellows only because he felt they were a self-perpetuating, independent, intellectual group who could not be fired; that the book contract was one between himself on the one hand, and himself and the other Senior Fellows on the other; that he, Comfort, was the victim of unethical conduct on the part of the Center's lawyer in the negotiations which led to the book contract, because he thought the lawyer was also representing him. I conclude from the evidence that plaintiff knew exactly what the status of the Senior Fellows was when he joined them; that he was told of the risks attendant to membership including that there was no tenure; that he was aware that Stanley Hatch was exclusively the Center's lawyer; and that he was acting as his own lawyer, (with the help of a book called "Be Your Own Lawyer") and with some occasional advice from his British lawyer, Mr. Appelby. I further conclude that there is no merit to plaintiff's allegations of fraud and he is entitled to no punitive damages.

■ The Center must be held to have effectively breached its agreement with Comfort respecting the book royalties when on May 10, 1975, it brought about the collapse of one of the principal considerations which led Comfort to agree upon the defendant as the nonprofit group with which he would share his royalties. Implicit in both parties' understanding of what led to the unholy contract was knowledge that Comfort wanted Eucalyptus Hill as a change of scene from the many years he had spent on the faculty at University College London where he had tenure; that he cherished a fuller participation in the Center's dialogues; that he wanted to do the type of research that Eucalyptus Hill encouraged; that he wanted to contribute to the prestigious Center magazine; that he wanted to be near Stanford University for occasional lecturing chores; and that he felt that from the Santa Barbara base, he could more earnestly pursue his lifelong interest in gerontology. In this respect the Center must be held to have "dissolved" itself on May 10, 1975 within the meaning that the

---

1. Two others were kept on the payroll until certain of their projects were completed.

term is used in paragraph 1(e) of the book contract.

I therefore conclude and find from the evidence as follows:

1. The Center is entitled to 20% of the net royalties on all copies of *Joy* sold outside the United Kingdom and pursuant to the terms of the book contract up to May 10, 1975. The balance of said royalties is the property of plaintiff and defendant shall pay said sum to him with interest at 7% from the date said funds were withheld.

2. The plaintiff is entitled to all royalties accruing from *Joy* from and after May 10, 1975, together with a reassignment to him by defendant of any copyright rights which defendant gained under the book contract. The book contract is declared to be at an end due to its breach by defendant, and any contractual provision therein calling for deferred payments from the Center to plaintiff is declared to be of no effect.

3. Until the sums of money mentioned hereinbefore as belonging to plaintiff are paid to him, the officers and directors of the Fund for the Republic and/or the Center for the Study of Democratic Institutions are enjoined from using or expending any of the net proceeds of the sale of the real property it owns in Santa Barbara and described as Eucalyptus Hill, except to pay therefrom any trust deed obligations now of record against said property.

4. The employment contract is declared to be at an end due to its breach by plaintiff, and the Center is under no obligation to continue Comfort in its employ from and after May 10, 1975, and is under no obligation to pay severance or other benefits to plaintiff.

5. Plaintiff is to be deemed the "prevailing party" within the meaning of paragraph 7 of the book contract which calls for the payment of attorney's fees. The parties shall confer and agree upon what is a reasonable fee for plaintiff's attorney by January 10, 1977, or appear in the courtroom of the undersigned judge at 9 A.M. on said day prepared to present evidence which will enable the Court to fix proper fees.

 6. Former counterdefendant Modsets incurred $4,868.39 costs and fees in producing discovered physical evidence at the demand of defendant and in serving as an impartial stakeholder for disputed funds. Modsets is entitled to receive payment of said sum from defendant Center/Fund. *Schirmer Stevedoring Company Ltd. v. Seaboard Stevedoring Corp.*, 306 F.2d 188, 194 (9th Cir. 1962).

Plaintiff shall prepare proposed findings of fact and conclusions of law and a form of judgment within 15 days and shall submit the same to defendants for approval as to form.